UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 21-11606-GAO

KAESER & BLAIR, INC.,
Plaintiff,

v.

AFFINITY SOURCING LLC,
CHRISTOPHER HARRIS,
Defendants/Third-Party Plaintiffs,

v.

HARVEST PACK, INC.,
POU LLC,
ALEXANDER POU, and
CHRISTINA POU,
Third-Party Defendants.

OPINION AND ORDER
August 11, 2026

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has issued a report and recommendation (dkt. no. 172) regarding plaintiff Kaeser & Blair, Inc.'s and third-party plaintiff Affinity Sourcing LLC's respective motions for partial summary judgment (dkt. nos. 136, 142). Before the Court is Affinity's timely objection to the report and recommendation. No other timely objection has been received.

The R & R recommends, in relevant part, that judgment enter for Affinity on its claim that third-party defendant Harvest Pack, Inc. is liable for breaching certain contracts to which Harvest Pack and Affinity are parties. The R & R does not, however, reach the separate question of the extent of Affinity's damages resulting from that breach. In Affinity's view, this was error. That is

so, Affinity says, because the nature and extent of the damages it incurred are "clear, easily calculable, and uncontroverted." (Def. Affinity Sourcing LLC's Partial Obj. to Part IV(A)(4) of Judge Donald L. Cabell's R. & R. on Mots. for Partial Summ. J. ("Affinity's Obj.") at 7 (dkt. no. 173).) Accordingly, Affinity asks the Court to enter an order awarding it damages in the amount of "$391,249 plus statutory interest of 1% per month from the date of [Harvest Pack's] breach," or alternatively, to hold a damages assessment hearing. (Id. at 8.)

As is relevant here, Kaeser and Affinity filed separate motions for partial summary judgment on the same question: whether Harvest Pack is liable for breaching its contracts with Affinity.[1] Kaeser, although not itself a party to the contracts, moved for summary judgment as a purported third-party beneficiary. Among other things, Kaeser argued to the magistrate judge that its breach-of-contract claim presented "no conflict" between the substantive state laws of Massachusetts and California. (Kaeser & Blair, Inc.'s Mem. in Supp. of Partial Mot. for Summ. J. at 14–15 (dkt. no. 139).) Therefore, Kaeser urged, "no choice of law analysis [was] required" to resolve the issue of Harvest Pack's liability at summary judgment. (Id.) Affinity's motion raised the same substantive issue—whether Harvest Pack breached the contracts at issue—but it did not expressly address the predicate choice-of-law question. Instead, Affinity "adopt[ed]" the "[a]rguments supporting summary judgment" that Kaeser advanced in its separate motion. (Affinity Sourcing LLC's Partial Mot. for Summ. J. at 2 (dkt. no. 142).) In effect, Affinity, too, argued to the magistrate judge that its breach-of-contract claim against Harvest Pack presented no choice-of-law conflict.

---

[1] The R & R recommends that the Court deny Kaeser's motion for partial summary judgment. That recommendation has not been challenged.

The magistrate judge agreed, expressly concluding that no conflict exists between California and Massachusetts law governing breach-of-contract claims. (See R. & R. on Mots. for Partial Summ. J. ("R. & R.") at 10–11 (dkt. no. 172) (comparing elements of breach-of-contract claims under Massachusetts and California law, respectively, and concluding "there is no conflict").) Accordingly, the R & R applies forum law, i.e., Massachusetts substantive law, without resolving the choice-of-law issue. Affinity now objects that the magistrate judge erred by resolving the question of Harvest Pack's liability without also recommending the entry of an award of damages plus statutory interest.

Affinity's objection is overruled. To be sure, the magistrate judge's recommendation that judgment enter for Affinity necessarily rests on the conclusion that Affinity suffered damages from Harvest Pack's breach, because both California and Massachusetts law require the plaintiff in a breach-of-contract claim to prove damages. (See R. & R. at 10–11 (quoting Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013); Kumaraperu v. Feldsted, 237 Cal. App. 4th 60, 70 (2015).) Indeed, as Affinity emphasizes, the R & R found that "Harvest Pack did not 'create a dispute of material fact as to whether Affinity suffered damages'" at summary judgment. (Affinity's Obj. at 7 (quoting R. & R. at 16–17).)

But *whether* Affinity suffered damages from Harvest Pack's breach and the *extent* of those damages are discrete questions. Affinity's objection elides them. Further, the latter question, like the former, can present choice-of-law conflicts. See, e.g., Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 40–41 (1st Cir. 2008). Yet, neither Affinity's motion for summary judgment nor its objection to the R & R addresses whether such a conflict exists between California and Massachusetts law, particularly with respect to the statutory damages to which Affinity claims it is entitled. That issue was therefore not properly before the magistrate judge at summary judgment.

3

Hence, it cannot form the basis of a proper objection to the R & R. See, e.g., Borden v. Sec'y of Health & Hum. Servs., 836 F.2d 4, 6 (1st Cir. 1987) (per curiam) ("Parties must take before the magistrate, not only their 'best shot' but all of their shots." (internal quotation marks omitted))).

For these reasons, Affinity's objection is OVERRULED, and the R & R is ADOPTED. Kaeser & Blair's Partial Motion for Summary Judgment is DENIED. Affinity Sourcing LLC's Partial Motion for Summary Judgment is GRANTED.

The case remains referred to the magistrate judge for further proceedings.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Kaeser & Blair, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Affinity Sourcing LLC and Christopher Harris, <br><br> Defendant and Third-Party Plaintiffs, <br><br> v. <br><br> HARVEST PACK INC., POU LLC, and ALEXANDER POU, <br><br> Third-Party Defendants. | No. 1:21-cv-11606-GAO |

**REPORT AND RECOMMENDATION ON MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT**

CABELL, U.S.M.J.

## I.   INTRODUCTION

The COVID-19 pandemic created a heightened commercial demand for personal protective equipment (PPE) that could help to lower the risk of catching or transmitting the virus.  This case involves one company's efforts to fill that demand.  In early 2021, Kaeser & Blair, Inc. ("K&B"), a products distributor, contracted with Affinity Sourcing LLC ("Affinity"), a products procurer, to facilitate the purchase and delivery of multiple shipments of

nitrile gloves.[1]   Affinity located a seller, Harvest Pack, Inc. ("Harvest Pack"), and placed three orders with them for a quantity of gloves.  The arrangement proved unsatisfactory -- Harvest Pack reportedly failed to deliver the first order of gloves at all and delivered gloves for the second and third orders that were of the wrong size or of inferior quality -- and this lawsuit then ensued.

K&B commenced the action by suing Affinity and its sole member, Christopher Harris (collectively, "Affinity"), for breach of contract (Count I), conversion (Count II), unjust enrichment (Count III), and a claim to pierce the corporate veil (Count IV). (D. 1).

Affinity in turn filed a third-party complaint against Harvest Pack and its related entities, Pou LLC, and Alexander Pou,[2] for breach of contract (Count I), breach of a guaranty (Count II), breach of Massachusetts' Chapter 93A consumer protection statute (Count III), and a claim to pierce the corporate veil (Count IV). (D. 10-1).

K&B then crossclaimed against those same third-party defendants, alleging in Count I that it can sue them for breach of

---

[1] Nitrile is a synthetic rubber commonly used in the manufacture of disposable gloves, often as an alternative material to latex. *See* Ashley Herkins et al., *Nitrile glove composition and performance-Substandard properties and inaccurate packaging information*, PLoS ONE, Oct. 31, 2024, at 1, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0312891.

[2] Affinity also named Christina Pou as a third-party defendant, but she was subsequently dismissed from this action for lack of personal jurisdiction.

contract as a "third party beneficiary" of Affinity's contracts with Harvest Pack, and also asserting claims for unjust enrichment (Count II), subrogation (Count III), and to pierce the corporate veil (Count IV).  (D. 21).

Two motions pend against this backdrop.  First, K&B moves for partial summary judgment on its third-party beneficiary claim for breach of contract.  (D. 136).  Second, Affinity moves for partial summary judgment on its breach of contract claim against Harvest Pack. (D. 142).  The motions have been referred to this court for a report and recommendation.  For the reasons explained below, the court recommends that K&B's motion be denied and that Affinity's motion be granted.

## II.  RELEVANT FACTS[3]

### A. Overview

All three transactions at issue were initiated in January 2021.  For each order, K&B, a distributor seeking to supply customers with PPE, contracted with Affinity, a distributor that would source the PPE, to purchase nitrile gloves.  ("Declaration of Kurt Kaeser in Support of Motion for Summary Judgment," D. 138-1 at ¶¶ 2-3; "Affidavit of Steve Tlumacki," D. 138-2 at ¶ 1; Affinity's Invoice for K&B Purchase Order No. 10111111, D. 138-

---

[3] The facts are undisputed unless otherwise noted.  Where there is a dispute, the court sets the facts out in the light most favorable to the defendants as the non-moving party. *See Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002).

15; Affinity's Invoice for K&B Purchase Order No. 10114021, D. 138-27; Affinity's Invoice for K&B Purchase Order No. 10122213, D. 138-37); "K&B's Statement of Facts in Response to Harvest Pack's Opposition to its Motion for Partial Summary Judgment," D. 151 at ¶¶ 1, 21-23). K&B retains independent contractors to distribute and sell its products, and for the three transactions at issue in this motion, K&B generally relied on independent contractor Impact Promotions ("Impact") to communicate on K&B's behalf.[4] (D. 151 at ¶ 1; 138-1 at ¶¶ 3-4).

For each transaction, Affinity contacted Harvest Pack, a company that sold PPE among other products, to obtain nitrile gloves ordered by K&B. (D. 151 at ¶¶ 4, 24-26, 36-38, 51-52). Christina Pou is the founder, CEO, President, and sole owner of Harvest Pack. (D. 151 at ¶ 5). Her brother, Alexander Pou ("Pou"), has been involved with Harvest Pack throughout its existence, though the degree of his involvement is in dispute. *Id.* at ¶¶ 9-20. In or around 2018, Alexander Pou formed Pou LLC "to do . . . wholesale trade between clients" and "pursue various business opportunities as they presented themselves," which included real

---

[4] Impact employees used Impact email addresses but included "Kaeser & Blair" in their email signatures.

estate ventures and the import and sale of latex and rubber gloves.[5]
*Id.* at ¶ 8.

    B. Order 1

    On January 11, 2021, K&B issued a purchase order to Affinity
for 10,000 boxes of size-medium nitrile gloves to be shipped to
K&B's client, Marshfield Clinic ("Marshfield").    (K&B Purchase
Order 10111111, D. 138-14; D. 151 at ¶¶ 21, 28).    Affinity sent
K&B an invoice for $165,000, and K&B paid that amount to Affinity
in satisfaction of the invoice.    (Affinity Invoice 011121-4, D.
138-15; D. 151 at ¶¶ 22-23).

    That same day, Affinity contracted with Harvest Pack to obtain
the gloves ordered by K&B (hereinafter, "Order 1").    (D. 151 at
¶¶ 4, 24).    Affinity issued purchase order no. 011121-6 to Harvest
Pack, and Harvest Pack sent Affinity a proforma invoice for
$161,000 in return.    Affinity Purchase Order 011121-6, D. 138-18;
Harvest Pack Pro Forma Invoice for P.O. 011121-6, D. 138-19; D.
151 at ¶¶ 24-25.    Affinity then paid the full amount of the proforma
invoice between January 11, 2021, to January 19, 2021.    *Id.* at
¶¶ 24-26.

    On or around February 3, 2021, Order 1 was loaded onto the
wrong shipping truck by Harvest Pack.    *Id.* at ¶ 27.    Harvest Pack

---

[5] Alexander Pou was the sole member and manager of Pou LLC.    (D. 151 at ¶¶ 6-7).    According to a declaration he submitted, Pou LLC is now defunct and has no operations, members, or managers.    *Id.*

5

retook possession of the gloves, which were returned to Harvest Pack's warehouse on February 11, 2021, and ultimately never delivered to Marshfield.  *Id.* at ¶¶ 28, 31.

C. <u>Order 2</u>

On January 21, 2021, K&B issued a purchase order to Affinity for more than 14,000 size-small nitrile gloves to be shipped to K&B's client, Prisma Health ("Prisma").  (K&B Purchase Order No. 10114021, D. 138-25; D. 151 at ¶¶ 33, 39).  That same day, Affinity sent K&B an invoice for $241,560, which K&B paid in full.  Affinity Invoice 012021-5, D. 138-27; D. 151 at ¶¶ 34-35.  Affinity had already issued the coinciding purchase order to Harvest Pack on January 20 (hereinafter, "Order 2") and Harvest Pack issued a proforma invoice for $231,312 on January 24.  (*Id.* at ¶¶ 36-37; Affinity Purchase Order 012021-5, D. 138-29; Harvest Pack Pro Forma Invoice for P.O. 012021-5, D. 138-30).  Affinity paid for the order in full between January 20 and January 25.  (D. 151 at ¶ 38).

On or around January 26, 2021, Order 2 was delivered to Prisma. (*Id.* at ¶ 39).  Much of the order, however, was incorrect. *Id.* at ¶¶ 40-41. Despite both K&B and Affinity's purchase orders requesting only small-size gloves, Prisma received a mixed assortment of small-, medium-, and large-sized gloves.  (D. 151 at ¶ 40; Alexander Pou and Pou LLC Deposition, D. 138-6 at 254:2-255:2; D. 138-25; 138-27; Email chain dated January 14, 2021, through February 4, 2021, D. 138-33).

6

When K&B's representative informed Pou of the erroneous delivery later that day, Pou apologized, agreed to pay a penalty per box of incorrect gloves, and stated that he would complete the order and send the outstanding gloves.  (D. 151 at ¶ 41; Email chain dated February 4, 2021, through February 5, 2021, D. 138-34).

D. Order 3

On January 22, 2021, K&B, through Impact, emailed Affinity the specifications for purchase order no. 10122213.  (Email dated January 22, 2021, D. 138-36; D. 151 at ¶ 47).  Affinity sent K&B an invoice for $99,000 that same day, which K&B paid in full on January 25 after sending the official purchase order.   (Affinity Invoice 012221-6, D. 138-37; K&B Purchase Order 10122213, D. 138-38; D. 151 at ¶¶ 48-50).  Affinity issued a purchase order to Harvest Pack on January 22 (hereinafter, "Order 3"), and, although the record does not include Harvest Pack's invoice for this order, the parties do not dispute that Affinity paid the $96,600 outlined in its purchase order that same day.  (*Id.* at ¶¶ 51-52; Affinity Purchase Order 012221-3, D. 138-40).

On February 22, 2021, Order 3 was delivered to Marshfield. (D. 151 at ¶ 53).  However, Marshfield rejected the gloves because they were "stained and [had] no real sizing," with Marshfield's representative stating that employees had tried on the gloves and observed that the sizing was not uniform.  (*Id.* at ¶¶ 53-54; Email

7

chain dated February 22, 2021, to March 24, 2021, D. 138-42). The client sent pictures of the stained gloves to K&B, which were forwarded to Affinity and Harvest Pack. (D. 138-42). The following day, Pou agreed to pick up the defective gloves and provide the correct gloves to complete the order. (D. 138-6 at 284:21-285:9; Email chain dated February 23, 2021, D. 138-43; Email chain dated February 22, 2021, to February 23, 2021, 138-44; Email dated February 23, 2021, D. 138-45; D. 151 at ¶ 55).

D. Efforts to Remedy Defects

As of March 11, 2021, none of the three orders had been filled satisfactorily; Order 1 had not been delivered, nor had the outstanding gloves from Orders 2 and 3 been delivered. (D. 151 at ¶¶ 29, 42, 56). In an email exchange dated March 11 through March 14, 2021, Pou offered to ship replacement gloves or provide a refund, minus penalty already paid, within 10 business days. (*Id.* at ¶¶ 29, 43, 57; D. 138-24). K&B accepted the offer of a refund on the same day. (D. 151 at ¶ 30). No refund was ever sent, however, nor were any replacement gloves delivered. (D. 138-24; D. 151 at ¶¶ 31, 32, 46, 45, 59).

Pou eventually offered to assume personal liability and sign a personal guarantee, and between March 31, 2021, and April 8, 2021, Pou and Affinity negotiated an agreement to "ease tensions from all angles." (Email dated March 30, 2021, D. 170-1; Email dated March 31, 2021, through April 8, 2021, D. 170-2). The

8

resulting document set out a $20,000 monthly payment schedule to reimburse Affinity "until any balances are settled." ("Amended Third-Party Complaint of Affinity Sourcing LLC and Christopher Harris," D. 23 at 19). Pou signed and initialed this document on April 5, 2021, and Harris subsequently signed and initialed (on behalf of Affinity) on April 8, 2021. (D. 170-2). Affinity alleges that Pou has not adhered to the $20,000 payment schedule, and Harvest Pack does not appear to dispute that fact. (D. 10-1 at ¶ 25).

### III. <u>LEGAL STANDARD</u>

To prevail on a motion for summary judgment, the movant must show "there is no genuine dispute as to any material fact." *Dusel v. Factory Mut. Ins. Co.*, 52 F.4th 495, 503 (1st Ci<u>r.</u> <u>2022</u>) (citation omitted). If the movant makes that showing, "the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor." *Id.* (citation omitted); *see also Clifford v. Barnhart*, <u>449 F.3d 276</u>, 280 (1st Ci<u>r. 2006</u>) ("[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trial worthy issue warrants summary judgment . . . .") (citation omitted). The record, including all reasonable inferences, is viewed in favor of

9

the nonmovant, however the court "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The nonmoving party cannot "rest upon mere allegation or denials," but must instead "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## IV.   ANALYSIS

As a threshold matter, the court must consider whether there is a true conflict of law between Massachusetts, where Affinity is based and where K&B has brought the case, and California, where the Harvest Pack is based. A conflict of law exists where there is an "actual conflict . . . between the substantive laws of the interested jurisdictions." *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004). Where the relevant contract principles are uniform across jurisdictions, however, and the "outcome is the same under the substantive law of either jurisdiction," no conflict exists and the court applies the law of the forum state. *See, e.g.*, *Cont'l Ins. Co. v. Neles-Jamesbury, Inc.*, No. CV 21-11767-TSH, 2023 WL 2665866, at *2 (D. Mass. Mar. 28, 2023) (citations omitted).

Applying those principles here, there is no conflict. To prove a breach of contract claim in Massachusetts, a plaintiff

10

must show that "(1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013). Similarly, in California, a plaintiff must show: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Kumaraperu v. Feldsted*, 237 Cal. App. 4th 60, 70 (2015). Accordingly, the case presents no conflict of law and the court will apply the law of the forum state, Massachusetts.

### A.   Affinity's Breach of Contract Claim

Affinity moves for summary judgment on its claim that Harvest Pack breached all three contracts for nitrile gloves. (D. 142). As noted above, to prevail on a breach of contract claim, a plaintiff must show: (1) the parties had a valid contract; (2) the plaintiff was able and ready to perform; (3) the defendant failed to perform; and (4) the plaintiff suffered harm as a result. *Bose Corp. v. Ejaz*, 732 F.3d at 21. The court agrees that summary judgment is warranted on the present record.

   1.   *Orders 1, 2, and 3 Were Valid Contracts Between Affinity and Harvest Pack.*

Regarding the first element, Harvest Pack does not dispute that Orders 1, 2, and 3 were valid contracts. It contends, however, that it was not a party to the three contracts, noting

that Affinity wired payment for the gloves not to Harvest Pack, but to Pou LLC. (D. 163 at 13-15). Affinity contends that wiring money to Pou LLC does not negate Harvest Pack's obligations under those contracts. (D. 143 at 8-9). The record favors Affinity on this point.

Specifically, the record reflects that Affinity did work with Alexander Pou on all three orders in January 2021, but Pou was clearly acting on behalf of Harvest Pack during that time, as well as before and afterwards. Indeed, the record reflects that Pou was an employee of Harvest Pack from at least January 2020 to July 2021. (D. 151 at ¶ 10). Further, Pou used a cell phone paid for by Harvest Pack; used a Harvest Pack email address to conduct business with Affinity and other customers; drove a leased vehicle paid for by Harvest Pack during the relevant period; and represented to Affinity on multiple occasions that he was working on behalf of Harvest Pack. (D. 151 at ¶¶ 14-15, 20). Further still, Christina Pou stated to the media that she and her brother were the founders of Harvest Pack. (D. 151 at ¶ 16; *see also* Christina Pou Deposition on June 16, 2025, D. 138-5 at 234:9-21, 235:22-236:16; Coco Huang, *Harvest Pack Takes Eco-Friendly Approach to Food Packaging*, LOS ANGELES BUSINESS JOURNAL (Sept. 27, 2020), D. 138-11). In short, the record demonstrates beyond dispute that Alexander Pou operated as a Harvest Pack principal in

dealing with Affinity. As such, the record shows that Affinity and Harvest Pack had valid contracts through Orders 1, 2, and 3.

To be sure, Harvest Pack points to a text exchange between Alexander Pou and Affinity representatives after the execution of Order 2, in which Affinity's representative asked Alexander Pou "Pou llc or harvest pack?", as suggesting that Affinity may have drawn some distinction between Harvest Pack and Pou LLC, thus creating a question of material fact as to whether Affinity was in fact contracting with Pou LLC rather than Harvest Pack. (D. 163 at 17-18; Affidavit of Alexander Pou in Opposition re Motion for Partial Summary Judgment Exhibit A," D. 164-1). In context, however, the text reflects no such dispute. During the relevant portion of the exchange, Max Leahy of Affinity texts Pou, "Wiring you now lock it in," followed immediately by the message "Pou llc or harvest pack?" Pou then responded "pou llc thank you." (D. 164-1). To the court, this exchange merely reflected an inquiry seeking clarity on where to direct payment to Harvest Pack but did not reflect any doubt on Affinity's part as to whether it was contracting with Harvest Pack or Pou. Moreover, according to Affinity employees, "it was not unusual to see brokers utilize multiple bank accounts to get deals done," and the fact that Pou LLC was listed as the recipient bank account did not raise any concerns to them or indicate to them that they were contracting

13

with anyone other than Harvest Pack.  (D. 138-2 at ¶¶ 17-18; 138-3 at ¶¶ 11-15, 17).

Pou also avers more generally in an affidavit that, regardless of what Affinity may have believed, he was never a shareholder, director, or officer of Harvest Pack, but rather intentionally "misrepresented" himself as a Harvest Pack principal, and even used its resources, in order to increase his social stature. (D. 142-1, ¶¶ 3-5).  However, the court does not credit this obviously self-serving assertion where Pou also acknowledges he was on Harvest Pack's payroll, and the record shows he used a Harvest Pack cell phone, a Harvest Pack email address, and drove a Harvest Pack leased vehicle.  "An affidavit that is simply 'an attempt to manufacture an issue of fact in order to survive summary judgment' is not admissible."  *See Casillas-Guardiola v. Bayer Puerto Rico, Inc.*, No. CV 22-1167 (GMM), 2025 WL 2806814, at *8 (D.P.R. Sept. 30, 2025) (quoting *Orta-Castro v. Merck, Sharp & Dohme Quimica P.R.*, Inc., 447 F.3d 105, 110 (1st Cir. 2006)).

2.    *Affinity Fulfilled Its Obligations Under the Contracts*

The record demonstrates beyond dispute that Affinity performed its obligations under the parties' contracts where it sent payment for the gloves to Harvest Pack after receiving an invoice for payment.  Harvest Pack does not seriously challenge this contention.

14

3.    *Harvest Pack Breached the Three Contracts*

Affinity contends that Harvest Pack's failure in each instance to deliver the goods consistent with the contract's specifications amounted to a breach of each contract.  (D. 143 at 5).  The court agrees.  The record shows that while Affinity paid Harvest Pack in full for all three orders, Harvest Pack failed in each instance to furnish the nitrile gloves Affinity contracted to buy.  With respect to Order 1, Harvest Pack simply failed to deliver any gloves at all.  Regarding Order 2, Harvest Pack did deliver some gloves but a significant portion of them were non-conforming because they were the wrong size.  Similarly, regarding Order 3, Harvest Pack delivered some gloves, but they were not all the correct size, and some were visibly stained.

Notably, Alexander Pou, both in his correspondence with the parties and in his deposition, admitted that some of the gloves Harvest Pack delivered were defective, and agreed on multiple occasions to help correct the errors through payments, refunds, and supplemental orders, although he never followed through.  (D. 23 at 19; D. 138-6 at 254:2-255:2, 284:21-285:9; 138-24; 138-34; 138-43; Email chain between Kurt Kaeser, Christoper Harris, and Alexander Pou, dated March 18, 2021, to March 22, 2021, 138-46; 138-47; D. 151 at ¶ 55; D. 170-1; 170-2).  On this record, there is no dispute that Harvest Pack breached all three contracts with Affinity.  *See, e.g.*, *Careandwear II, Inc. v. Nexcha LLC*, 581 F.

15

Supp. 3d 553, 554-555 (S.D.N.Y. 2022) (summary judgment granted in favor of plaintiff as to breach of contract claim where defendant delivered one order of nitrile gloves which was nonconforming, never delivered the other, and then failed to complete the order or send a refund as agreed upon); *W. Trenton Hardware, LLC v. Brooklyn Textiles*, LLC, No. CV 21-17662 (GC) (TJB), 2024 WL 4263209, at *1 (D.N.J. Sept. 23, 2024) (default judgment granted in favor of plaintiff as to breach of contract and other claims where defendant delivered orders of nitrile gloves which in part did not conform to the purchase orders); *Assure Glob., LLC v. Anderson*, 763 F. Supp. 3d 476 (S.D.N.Y 2025) (same).

4.    *Affinity Suffered Damages from Harvest Pack's Breaches*

The record shows that K&B paid Affinity a total of $505,560 ($165,000, $241,560, and $99,000, respectively) to facilitate the purchase of the gloves from Harvest Pack.  After accounting for some credits, Affinity contends that Harvest Pack still owes it $391,249 for its breaches of their contracts.  (Affidavit of Steve Tlumacki, D. 143-1).

Harvest Pack challenges the amount as "speculative," but the court finds that the record supports its reliability.  Affidavits are admissible where they are based on "personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Here, the affidavit is from

16

Steve Tlumacki, one of two Affinity employees who participated in each transaction at issue. (D. 143-1). As stated in his affidavit, his mathematical calculations are based upon his "personal knowledge and review of the billing records and emails as reflected in Affinity's Third-Party Complaint," and he further cites to and references the purchase orders from which his calculations arise. *Id.* at ¶¶ 1-6. Further, even assuming Harvest Pack is heard to dispute the actual amount of damages, it has not adduced any evidence to counter Affinity's allegation that Harvest Pack breached the parties' agreements and thereby caused Affinity to suffer damages. It is well established that summary judgment may be rendered on the issue of liability alone, even where there may be a genuine issue as to the specific amount of damages. *See* Fed. R. Civ. P. 56(g) ("If the court does not grant *all* the relief requested," i.e., the specific amount damages, the court "may enter an order stating that any material fact," i.e., the facts regarding liability, are "not genuinely in dispute and treating those facts as established." (emphasis added)). As such, Harvest Pack's attack on the reliability of the affidavit does not create a dispute of material fact as to whether Affinity suffered damages.

In sum, the record shows that Harvest Pack breached valid contracts with Affinity, causing Affinity to suffer harm. Affinity is therefore entitled to summary judgment on its breach of contract claim.

17

5.    *Harvest Pack's Other Arguments in Opposition Fail*

To be sure, Harvest Pack raises a number of arguments in opposition to Affinity's motion, but none resonate.  Among them, they argue that the contracts listed an unspecified delivery date ("ASAP") and, because of that, there was no deadline for performance and Harvest Pack thus did not breach the contracts when it failed to promptly deliver conforming goods.  Harvest Pack asserts moreover that a large quantity of the gloves are still sitting in a warehouse capable of being retrieved, suggesting if not actually arguing that the contracts remain open to this day, years later.  Accordingly, so Harvest Park appears to argue, there is a genuine dispute as to whether Harvest Pack was obligated to deliver conforming goods by a certain date, and thus a dispute as to whether it breached the contracts when it did not complete delivery by then.  The court finds this argument to be without merit.

As an initial matter, the lack of a definite time-period for performance does not invalidate a contract.  *See e.g., McClain v. Cape Air*, No. 22-CV-10649-DJC, 2023 WL 8602944, at *4 (D. Mass. Dec. 12, 2023); *Targus Grp. Int'l, Inc. v. Sherman*, 76 421, 431, 922 N.E.2d 841, 850 (Mass. App. Ct. 2010) ("Ambiguous or indeterminate material terms can render an attempted agreement too uncertain for enforcement[,]" but "the law does not demand impracticable precision from contracting parties").  More

18

to the point, where contracts do not include specific times for performance, the "court may 'furnish a time element reasonable in the circumstances of the parties' dealings.'" *Targus Grp. Int'l, Inc.*, 922 N.E.2d at 850; *see also Charles River Park, Inc. v. Bos. Redevelopment Auth.*, 557 N.E.2d 20, 32 (Mass. App. Ct. 1990) (explaining that reasonable time can be determined from "the nature of the contract, the probable intention of the parties as indicated by it, and the attendant circumstances"). *McClain*, 2023 WL 8602944, at *13.

Here, it is clear from the record that Alexander Pou (and thus Harvest Pack) understood that Affinity expected the goods to be delivered as quickly as possible, particularly where the orders related to efforts to procure PPE during the COVID-19 pandemic. Regarding the shipping of Order 1, for example, Impact sent emails to Pou reflecting the sense of urgency: "Please see attached . . . for the 12 pallet pickup today. . . . We have to get this picked up today no matter what!"; "What is the ETA? Client is hounding us for answers.  We need to let them know ASAP."  D. 138-22. Similarly, regarding the effort to remedy the delivery of non-conforming goods relating to Order 2, Impact sent Pou an email with the subject line "URGENT ALEX," and entreaties for quick action such as: "How fast can you get this ready to be picked up?"; "I want to see a truck booked tomorrow"; "Ship the Small replacement Gloves tomorrow as promised - please provide pick up

19

confirmation and ETA immediately tomorrow"; "Today it is imperative for you to complete the following"; "I need a fast truck to my client!". D. 138-34. Also, Steve from Affinity texted Pou on January 21st that "it has to be available for pickup Monday at the latest, which you promised us." D. 150-7 at 5. Further, Max Leahy from Affinity texted Pou on January 24th that "Nicole just texted me saying if she doesn't have it tonight she is canceling that order." D. 150-7 at 3.

Based on the foregoing, it is clear beyond dispute that "ASAP" did not mean, and could not ever reasonably mean, that Harvest Pack somehow enjoyed an open-ended time-period in which to perform, including months or even years after the contracts were made. Rather, the court finds from the record that the parties contemplated and expected that Harvest Pack would deliver conforming goods as soon as practicable, within days of the orders being placed. As such, no reasonable factfinder could conclude that Harvest Pack did not breach the contracts when it failed to deliver goods at all (Order 1) or when it delivered non-conforming goods, which it acknowledged but failed to ever correct (Orders 2 and 3).

Harvest Pack argues next that, assuming the parties had a valid contract, Alexander Pou and Affinity's Christopher Harris effected a novation, meaning they agreed to cancel the original contracts and replace them with a new contract that extinguished

20

Harvest Pack's obligations and shifted them onto Pou alone.  The relevant facts underlying this assertion are as follows.

After issues arose with Orders 1-3, Pou and Harris executed a document in which Pou agreed to "personally guarantee and assume all financial liabilities related to Affinity Sourcing LLC through [him]self, Harvest Pack, Inc and Pou LLC."  D. 23 at 19.  As part of this agreement, Pou further stated that "if sooner agreements or settlements cannot be made within 30 days of th[e] signed letter, [he would] make a minimum of $20,000 a month as reimbursement to Affinity Sourcing Group until any balances are settled."  *Id.*  Below this, both he and Harris placed their initials next to each listed purchase order and the corresponding outstanding payment.  *Id.*

A "novation is created when there is an agreement by the parties to allow for a different party to substitute for another party and to incur the responsibilities of that contract." *Admiral Metals Servicenter Co. v. Micromatic Prods. Co.*, 2003 WL 369709, at *3 (Mass. Super. Jan. 24, 2003) (citations omitted).  As that definition suggests, it requires "(1) an existing valid original obligation, (2) an agreement of all parties to the new contract, (3) the extinguishment of the old contract, and (4) a valid new contract."  *See Zurich American Ins. Co. v. Watts Regulator Co.*, 860 F.Supp.2d 78, 90 (D. Mass. 2012).

Harvest Pack cannot prove a novation on this record because, even if Pou, a Harvest Pack principal, somehow subjectively believed that he was shifting Harvest Pack's obligations from Harvest Pack to himself, he cannot demonstrate that *Affinity* understood the same and agreed to relieve Harvest Pack of its obligations.  Indeed, the guaranty does not even mention Harvest Pack, let alone state that Orders 1-3 were being extinguished in favor of a new contract between Affinity and Pou.  Moreover, Harvest Pack's argument flies in the face of the well-established notion that a personal guaranty does not serve to shift liability onto or away from another party, and instead is viewed as collateral to the original contractual obligation between the creditor and the principal.  *See* 38 Am Jur 2d, Guaranty § 2; *Cent. Ceilings, Inc. v. Nat'l Amusements, Inc.*, 873 N.E.2d 754, 759 n.8 (Mass. App. Ct. 2007) (a "guaranty" is a "collateral undertaking [for which] someone else is primarily liable [and which] the guarantor will pay . . . if the primary debtor does not.").

Accordingly, the court finds that Pou's promise to Affinity to guarantee Harvest Pack's debts was nothing more than collateral to provide Affinity some comfort; by contrast it did not effect a novation of the original contracts or extinguish Harvest Pack's obligations thereunder.  *See SPARTA Ins. Co. v. Pennsylvania Gen. Ins. Co.*, 802 F. Supp. 3d 201, 210 (D. Mass. 2025) (A novation can be inferred "despite a lack of express language" but the parties'

22

intent to extinguish the original obligation must be "clear and definite"); *Lipson v. Adelson*, 456 N.E.2d 470, 472 (Mass. App. Ct. 1983).[6]

Finally, Harvest Pack argues that Affinity failed to try to mitigate its damages after any breach.  Where a party is injured by a breach of contract, a duty is imposed upon it to "exercise reasonable diligence and ordinary care in attempting to minimize its damages."  *Performance Indicator, LLC v. Once Innovations, Inc.*, 56 F. Supp. 3d 99, 102 (D. Mass. 2014) (citing *Fleet Nat. Bank v. Anchor Media Television, Inc.*, 45 F.3d 546, 561 (1st Cir. 1995)).   The reasonableness of a party's attempts to mitigate damages is "a highly fact-specific and contextual inquiry" and is to be "evaluated under the totality of the circumstances." *Performance Indicator, LLC,* 56 F. Supp. 3d at 102 (citations omitted).  The duty to mitigate damages arises once the plaintiff learns of the breach, not before.  *See Seguros Caracas de Liberty Mut., S.A. v. Goldman, Sachs & Co.*, 502 F. Supp. 2d 183, 190 (D. Mass. 2007).   Where there is any dispute of fact as to the reasonableness of that mitigation, summary judgment is not proper. *Softub, Inc. v. Mundial, Inc.*, 53 F. Supp. 3d 235, 259 (D. Mass. 2014).

---

[6] California law provides similarly so there is no potential choice of law question regarding this issue.  *See Wells Fargo Bank v. Bank of America* (1995), 32 Cal. App. 4th 424, 431-432.

23

Harvest Pack relies on *Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 864 N.E.2d 518 (Mass. App. Ct. 2007), to argue that Affinity failed to mitigate damages.  (D. 163 at 15). In *Brewster*, the court found that a wallpaper distributor failed to mitigate its damages where it did not seek to find replacement products to sell to its customers after its manufacturer failed to deliver products as promised, causing the distributor to lose business from its inability to supply its customers.  *See Brewster Wallcovering Co.*, 864 N.E.2d at 548.  Analogizing, Harvest Pack argues that Affinity was required to mitigate its damages from any breach by finding other suppliers to satisfy its needs.

Harvest Pack's reliance on *Brewster* is misplaced.  Unlike in *Brewster*, Affinity's damages are not based on a loss of business. Rather, while Affinity does allege that Harvest Pack's breaches caused them harm with respect to Affinity's relationship with K&B, Affinity seeks here to reclaim the amounts it paid directly to Harvest Pack/Pou.  As Affinity notes, even if it had sourced alternative gloves to provide to K&B and their clients, as Harvest Pack suggests it should have, it still would be short the payments it made to Harvest Pack/Pou for goods that were never delivered. Absent being able to successfully persuade Harvest Pack to return those funds, Affinity had no way to mitigate its damages.[7]

---

[7] Harvest Pack also identifies two procedural deficiencies in Affinity's filings as "doom[ing]" its motion for summary judgment.  Neither argument goes far. First, it contends that Affinity failed to provide its own statement of facts,

## B.    K&B's Third-Party Beneficiary Claim

K&B also seeks to sue Harvest Pack for breaching the contracts with Affinity.  In moving for summary judgment, K&B relies on the theory that it can sue Harvest Pack as a third-party beneficiary to the contracts.  It argues that Affinity contracted with Harvest Pack in order to fulfill the contracts between K&B and Affinity.

---

choosing instead to largely incorporate the facts as set out by K&B in its motion, in violation of Local Rule 56.1.  Consequently, so Harvest Pack argues, the court is burdened with having to "ferret" through the record to organize the evidence presented.  Local Rule 56.1 is indeed sometimes referred to as an "anti-ferret rule" designed to prevent litigants from shirking their responsibility of clearly presenting the evidence supporting their arguments and placing that burden on the district court. *See Mackey v. Town of Tewksbury*, No. CV 15-12173-MBB, 2020 WL 68243, at *5 (D. Mass. Jan. 7, 2020) ("As an anti-ferret rule, LR. 56.1 serves to focus the court's attention on the matters genuinely in dispute.").  The problem for Harvest Pack's argument here is that Affinity has in fact provided a statement of facts.  See "Statement of Undisputed Material Facts in Support of Affinity Sourcing LLC's Partial Motion for Summary Judgment," D. 144; D. 151.  In any event, the court declines to treat Affinity's treatment of the facts as a violation warranting denial of its motion as a sanction.

Second, Harvest Pack contends that Affinity does purport to provide some "facts" to support its damages calculation, but the facts are merely legal contentions disguised as facts.  In its statement of facts, Affinity submits two facts in addition to those it incorporates from K&B's statement of facts, both speaking to damages. (D. 144 ("71. Harvest Pack's breach caused Kaeser & Blair damages of $340,960 and Affinity to sustain additional damages of $50,289," and "72. The total amount owed by Harvest Pack as a result of its breach is $391,249, plus statutory interest of 1% interest per month from the date of breach in March 2021 (54% interest), for a total of $602,253.46. See M.G.L. c. 231, § 6C.")).  However, where Affinity makes the assertions based on the purchase orders, invoices, and affidavit of Steve Tlumacki, which are all supported by the record, the court finds Affinity's statements to be rooted in fact, not law.  (*See* D. 143-1).  The court agrees with Harvest Pack's additional observation that the two contentions are not supported by "page references to affidavits, depositions and other documentation" pursuant to Local Rule 56-1. (D. 163 at 11 (citing D. Mass. L.R. 56-1)).  That said, "the district court has authority to interpret its own local rules in nontechnical ways" and the "nonliteral reading of the summary judgment rule falls well within the scope of that legal authority." *City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 243 (1st Cir. 1993) (citations omitted).  Here, where the documentation supporting Affinity's two facts is attached to its memorandum as Exhibit 1, the court does not view any technical noncompliance with the Local Rules to warrant further attention, let alone the suggested draconian sanction of summary denial of Affinity's motion.

To support a third-party beneficiary claim in Massachusetts, a third party must show that they were the *intended*, rather than *incidental*, beneficiary of the contract at issue.[8] *Zoll Med. Corp. v. Barracuda Networks, Inc.*, 565 F. Supp. 3d 101, 109 (D. Mass. 2021) (citations omitted); *Maxfield v. UKG Inc.*, No. 22-CV-10947-ADB, 2025 WL 1581308, at *5 (D. Mass. June 4, 2025). While an intended beneficiary of a promise or contract has standing to sue to enforce the contract or for a breach of it, an incidental beneficiary has no such rights. *See Alicea v. Machete Music*, 744 F.3d 773, 784 (1st Cir. 2014) ("Merely incidental beneficiaries lack standing to enforce a contract."); Restatement (Second) of Contracts § 302 (1981). The mere fact that one stands to benefit from a contract does not by itself make that person an intended beneficiary. *Maxfield*, 2025 WL 1581308, at *5 (citing *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 229 (1st Cir. 2005)); *Bay Club Members, LLC v. Selective Ins. Co. of Am.*, 654 F. Supp. 3d 1, 6 (D. Mass. 2023) (citing *Lakew v. MBTA*, 844 N.E.2d 263, 268 n.10 (Mass. App. Ct. 2006).

---

[8] The parties agree that there are "no meaningful conflicts between Massachusetts and California law" on the issue of third-party beneficiary and that Massachusetts law therefore applies. The court proceeds accordingly. *See FinSight I LP v. Seaver*, 50 F.4th 226, 230 (1st Cir. 2022) (citing, *cf.*, *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991) ("a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement.")).

The central inquiry in determining whether a nonparty to a contract may maintain an action as a third-party beneficiary is the intent of the contracting parties themselves. *See McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994). A party is considered an intended beneficiary when the language and circumstances of the contract indicate a "clear and definite" intent that the party would benefit from the promised performance. *See Anderson v. Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 366 (1997). If the terms of the contract are clear, the parties' intent is ascertained from the contract itself. *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). If the contract is unclear, a court may assess the parties' intent by inquiring into the reasonableness of the putative beneficiary's reliance on the intent manifested in the promise. *See* Restatement § 302(1)(b) cmt. d; *Public Serv. Co. of N.H. v. Hudson Light & Power Dep't*, 938 F.2d 338, 342 (1st Cir. 1991). An intended beneficiary need not be specifically named in the contract so long as they fall "within a class clearly intended by the parties to benefit from the contract." *Massachusetts v. Mylan Laboratories*, 357 F. Supp. 2d 314, 326 (D. Mass. 2005).

Turning against this backdrop to the "language and circumstances" of Orders 1-3, it is not evident that Affinity and Harvest Pack "clearly and definitely" intended for K&B to benefit from the contracts. First, nothing in the four corners of the

27

documents comprising the three orders suggests, let alone demonstrates with clarity and definiteness, that Affinity and Harvest Pack specifically intended K&B to benefit from the contracts.

Regarding Order 1, the purchase order Affinity issued to Harvest Pack on January 11, 2021, did not mention K&B, nor did the proforma invoice that Harvest Pack issued to Affinity that same day. (D. 138-18, D. 138-19). Rather, under the heading "SHIP TO," Affinity wrote "Client to handle logistics," and likewise next to the text "Ship Via," Harvest Pack wrote the same. (*Id.*) Order 2 follows a similar script: In their purchase order on January 20, 2021, under the heading "SHIP TO," Affinity wrote "Client will Pick up 1/25/21," and in their proforma invoice on January 24, 2021, Harvest Pack wrote "Client Arrange Shipping." (D. 138-29, D. 138-30). Similarly, for Order 3, Affinity wrote in its purchase order to Harvest Pack that "Client will pick up." Harvest Pack's invoice for this transaction was not in evidence, but K&B makes no contention that they were explicitly named or that Order 3 was handled any differently than the first two orders. (D. 138-40).

To be sure, K&B argues that it is *the* "Client" named in each purchase order. (D. 149 at 2). K&B emphasizes that it was in regular communication (through Impact) with Harvest Pack from the day after the first Affinity-Harvest Pack purchase order was issued

28

through the second and third orders.   (D. 149 at 3; *see also* D. 138-23; D. 150-2; 150-3; 150-5; 150-6; 150-8; Correspondence between Rae Elario and Alexander Pou coordinating the shipment of Order No. 1 with K&B P.O. No. 1 referenced in the subject line, D. 150-11).   More generally, K&B argues that Affinity and Harvest Pack entered into the contracts expressly for the purpose of supplying goods to K&B's customers and that, therefore, the purpose of the contracts was to provide a benefit to K&B.   (D. 139 at 27-28).    To that end, K&B argues that "courts distinguish circumstances where 'benefiting a third person is the intended purpose of one or both contracting parties, and situations where the benefiting is merely a means to the fulfillment.'" ("Kaeser & Blair, Inc.'s Reply Memorandum in Support of its Partial Motion for Summary Judgment," D. 149 at 10 (citing *Macksey v. Egan*, 633 N.E.2d 408, 412 (Mass. App. Ct. 1994))).

However, Harvest Pack counters that it did not know (at least initially) that the contracts were to benefit K&B.  Regarding Order 1, for example, K&B apparently did not begin to involve itself in interactions concerning the logistics and delivery of the goods until at least the day after the purchase order was issued. Moreover, Pou avers that, although he learned that the gloves for Order 1 were to be delivered to Marshfield, he did not know if that was Affinity's customer or even a customer of Affinity's customer.   (D. 141-2, ¶¶ 7-8).  Regarding Orders 2 and 3, Pou avers

29

similarly that he did not know where those orders were going because delivery was to be coordinated by Affinity, and he did not deal with anybody at K&B "until well after a dispute arose over the three orders." (*Id.*, ¶¶ 7-8). Pou does acknowledge that he dealt with Impact while the orders were being processed but contends that he never knew what relationship, if any, Impact had with K&B. (*Id.*, ¶ 10). Pou's assertions here are arguably self-serving but the court may properly consider them where they are based on his firsthand involvement and are not patently belied by the larger record. *See Cadle Co. v. Hayes*, 116 F.3d 957,961 n.5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment."). Even assuming a full airing of the evidence would tend to support K&B's characterization of the parties' relationships, there is for now a dispute of material fact as to whether Harvest Pack knew that the three contracts at issue were intended to benefit K&B specifically. Accordingly, K&B is not entitled to summary judgment on its claim. *See Hawaiian Airlines, Inc., v. AAR Aircraft Services, Inc.*, 167 F.Supp.3d 1311, 1319 (S.D. Fla. 2016) (denying motion for summary judgment for breach of third-party beneficiary contract where neither the purchasing documents nor the dealings between the parties expressed a clear

30

intent by both parties to primarily and directly benefit the third party).

## V.   <u>**CONCLUSION**</u>

For the reasons discussed above, Affinity's Motion for Partial Summary Judgment against Harvest Pack as to Count I of its Third-Party Complaint (D. 142) should be <u>**GRANTED**</u>; and K&B's Motion for Partial Summary Judgment on Count I of its Crossclaim against Harvest Pack (D. 136) should be <u>**DENIED**</u>.[9]

<u>/s/ Donald L. Cabell</u>
DONALD L. CABELL, U.S.M.J.

DATED: March 12, 2026

---

[9] The parties are hereby advised that under the provisions of <u>Federal Rule of Civil Procedure 72(b)</u>, any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See *Keating v. Sec'y of Health & Human Servs.*, <u>848 F.2d 271</u> (1st Ci<u>r. 1988</u>); *United States v. Emiliano Valencia-Copete*, <u>792 F.2d 4</u> (1st Ci<u>r. 1986</u>); *Scott v. Schweiker*, <u>702 F.2d 13, 14</u> (1st Ci<u>r. 1983</u>); *United States v. Vega*, <u>678 F.2d 376, 378-379</u> (1st Ci<u>r. 1982</u>); *Park Motor Mart, Inc. v. Ford Motor Co.*, <u>616 F.2d 603</u> (1st Ci<u>r. 1980</u>); *see also Thomas v. Arn*, <u>474 U.S. 140</u> (1985).